**In re CCT COMMUNICATIONS, INC., Former Debtor.**

**Global Crossing Telecommunications, Inc., Plaintiff,**

v.

**CCT Communications, Inc., Defendant.**

**Bankruptcy No. 07–10210 (SMB).**
**Adversary No. 07–1942.**

United States Bankruptcy Court, S.D. New York.

July 22, 2011.

See also 2008 WL 2705471.

Robert J. Rosenberg, Esq., James Brandt, Esq., John D. Castiglione, Esq., Elizabeth R. Marks, Esq. of Counsel, Latham & Watkins LLP, New York, NY, and George Royle V, Esq., of Counsel, Drummond Woodsum & MacMahon, Portland, ME, for Plaintiff Global Crossing Telecommunications, Inc.

James A. Karamanis, Esq., of Counsel, Zane D. Smith & Associates, Ltd., Chicago, IL, for CCT Communications, Inc.

**MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR PARTIAL SUMMARY JUDGMENT**

STUART M. BERNSTEIN,
Bankruptcy Judge.

This litigation arises out of series of agreements under which the plaintiff, Global Crossing Telecommunications, Inc. ("Global Crossing"), agreed to provide telecommunications services to the defendant, CCT Telecommunications, Inc. ("CCT"). CCT resold the services to third parties.

After Global Crossing stopped providing some of the services, it commenced this adversary proceeding primarily seeking declaratory relief, and CCT eventually counterclaimed, *inter alia*, for damages arising from Global Crossing's alleged breach of contract and its violations of the Federal Communications Act of 1934, as amended, 47 U.S.C. § 151 *et seq.* (the "Communications Act").

Global Crossing has now moved for partial summary judgment. The motion presents two questions: is the limitation on liability in the parties' contract enforceable, and if it is, what is the scope of the limitation? On the first point, the Court concludes that the clause is enforceable with respect to all state law and Communications Act damage claims. On the second, the Court concludes that while the clause plainly bars consequential damages, its full reach cannot be determined as a matter of law.

**BACKGROUND**

Unless otherwise noted, the material facts concerning the motion are not in dispute. In addition, the Court has already conducted a trial of certain of the claims asserted by the parties, and in connection with that trial, made findings of fact and conclusions of law. *See Global Crossing Telecomm., Inc. v. CCT Commc'ns, Inc. (In re CCT Commc'ns), Adv. Proc. No. 07–1942, 2008 WL 2705471 (Bankr.S.D.N.Y. July 2, 2008) ("CCT Commc'ns").* The background discussion, which is primarily based in those findings,

is limited to that necessary to understand this decision.

## A. The Parties' Contract

At all relevant times, Global Crossing was a common carrier engaged in the business of providing telecommunications services. CCT was also a common carrier engaged in the business of buying and reselling telecommunications services. The parties' business relationship began in 2005, and expanded in 2006 when they signed the "Retail Customer Agreement" or RCA.[1] Under the RCA, Global Crossing levied a "per minute" usage charge based on the origin or destination of a call. The services were limited to the 50 states, the RCA ran for three years, and obligated CCT to pay a monthly usage guarantee, or MUG, of $60,000. Importantly, the RCA contained a clause (§ 6.2) limiting the types of damages that either party could recover from the other:

> **Exclusion of Consequential Loss.** In no circumstances shall either we or you be liable for indirect, consequential, reliance, or special loss or damages or for lost revenues, lost savings, lost business opportunity or lost profits of any kind.

In December 2006, and after substantial negotiations, the parties executed an amendment to the RCA (the "Amendment"). Global Crossing agreed to provide services to CCT under its "All You Can Eat," or AYCE program, which is discussed at length in *CCT Commc'ns*, 2008 WL 2705471, at *2–3. Briefly, Global Crossing charged a flat monthly fee in lieu of "per minute" usage charges for certain landline and mobile calls terminating in specific geographic areas (the "Zero–Rated Destinations"), including Europe and the Caribbean. The Amendment included a 26–page schedule (Appendix 3) which set forth the rates—zero or some other rate—

that Global Crossing would charge CCT for calls terminating at a particular destination. In other words, the flat monthly fee covered certain destinations while a per-minute usage charge applied to others.

In addition to the Amendment, the parties also prepared and signed a series of four order forms to implement the AYCE pricing. The first two entitled CCT to purchase 1,344 concurrent call sessions at a monthly recurring charge of $71 per session, or a total of $95,424 per month (plus taxes and fees). The second set of orders entitled CCT to purchase an additional 2,016 concurrent call sessions for a monthly recurring charge of $71 per session, or a total of $143,136 per month (plus taxes and fees). Each order ran for three years.

The Amendment did not affect § 6.2.

## B. Global Crossing Blocks CCT's Service

Soon after the Amendment was executed, CCT began sending a volume of international calls over Global Crossing's network to zero-rated international mobile destinations, which resulted in Global Crossing incurring relatively high termination costs that it had to "eat" under the AYCE and could not pass on to CCT. Global Crossing became concerned that providing service to CCT under the AYCE plan was too costly, and looked for ways to shut down CCT's international traffic.

On or about January 10, 2007, Global Crossing sent Dean Vlahos, CCT's president, a proposed contract amendment. The amendment would have eliminated all mobile international calling areas and all calling areas in the Caribbean from the scope of the AYCE pricing plan without

---

**1.** CCT signed the RCA on April 1, 2006, and Global Crossing signed on June 29, 2006.

reducing the monthly recurring charges. Vlahos declined to sign it.

The next day, January 11th, Glenn Swartz, Global Crossing's Director of Credit and Collections, sent CCT a letter. (*Declaration of Dean S. Vlahos,* dated Feb. 26, 2011 ("*Vlahos Decl.*"), Ex. 17 (ECF Doc. # 228).)[2] The letter stated that CCT's "calling pattern does not meet the standard profile," and Global Crossing decided it had to change CCT's rate structure or terminate service. Because CCT refused to sign the proposed amendment (although CCT had supposedly agreed orally to discontinue and/or redirect all Caribbean international traffic and give further consideration to redirecting all international traffic), Global Crossing had "blocked international capabilities" and would continue doing so "until such time that CCT returned the executed Amendment." The penultimate paragraph added that CCT had exceeded the credit limit granted by Global Crossing, and gave CCT notice that its services were subject to full termination at noon, EST, on January 25, 2007. The final paragraph concluded that Global Crossing was open to a mutual resolution to avoid the full termination of CCT's services and welcomed the opportunity to discuss the matter.

Vlahos responded by e-mail later that day. (*See Vlahos Decl.,* Ex. 18.) He disputed that CCT had exceeded its credit limit, emphasized that the Amendment provided for a fixed monthly fee, and asserted that nothing in the RCA allowed Global Crossing to terminate based on its net costs. Nevertheless, as a gesture of CCT's good faith, Vlahos stated that he might agree to voluntarily suspend international calling outside of the Caribbean while CCT attempted to resolve any issues with Global Crossing, provided that all parties acted in good faith. Otherwise, the disputes would be resolved through litigation.

Vlahos never signed the proposed amendment, the parties failed to reach an accord, and Global Crossing completed blocking CCT's international call termination capabilities, except for calls to Canada, on or about January 17, 2007. On or about January 26, 2007, Global Crossing sent a letter to Vlahos purporting to terminate the Agreement, this time asserting that CCT's resale of Enterprise VoIP Local Service "constitutes a material breach" of the parties' contract. Before Global Crossing could actually terminate all of the services, CCT commenced its chapter 11 case on January 28, 2007.

## C. This Adversary Proceeding

Global Crossing eventually commenced this adversary proceeding seeking declaratory relief, and CCT counterclaimed, *inter alia,* for breach of contract and violations of the Bankruptcy Code and the Communications Act.[3]

The Communications Act claims sought damages under 47 U.S.C. § 206.[4] (*Answer, Affirmative Defenses, and Counterclaims of Defendant–Counterclaimant CCT Communications, Inc. to Second*

---

**2.** All citations to the ECF refer to this adversary proceeding.

**3.** The Court subsequently dismissed the chapter 11 case but retained jurisdiction over this adversary proceeding.

**4.** Section 206 states that a common carrier that violates the Communications Act "shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case." 47 U.S.C. § 206.

*Amended Complaint,* dated Mar. 22, 2010 ("*Answer*") (ECF Doc. # 161).) Count II alleged that Global Crossing's blocking, throttling and/or choking CCT's telephone call traffic were unjust and unreasonable practices under 47 U.S.C. § 201(b)[5] and, along with Global Crossing's failure to furnish service to CCT under CCT's orders for AYCE services and/or pricing, constituted the failure to furnish service upon reasonable request under 47 U.S.C. § 201(a).[6] (*Answer* ¶¶ 39–40.) Count III alleged that the prohibitions on resale, including the technical interconnection requirements imposed by Global Crossing on end-users, violated 47 U.S.C. §§ 201(a), 201(b), 202(a)[7] and 251(b)(1).[8] (*Answer* ¶¶ 49–50.)

These counts are not at issue on this motion, but a related claim, Count VII, is. In Count VII, CCT sought declaratory relief that § 6.2 of the RCA did not limit the damages it was seeking under the Communications Act and New York law. (*Answer* ¶ 67.) CCT made two, alternative arguments. First, CCT alleged that § 6.2 was "invalid and unenforceable un-der the Communications Act because it is unjust and unreasonable and contains no exception for liability arising from violations of the Communications Act, and therefore conflicts with 47 U.S.C. § 206." (*Answer* ¶ 70.) Second, CCT argued that Global Crossing's breaches of contract and violations of the Communications Act constituted "willful, intentional or reckless misconduct, gross negligence, intentional wrongdoing, or bad faith." (*Answer* ¶ 72.) As a result, § 6.2 was unenforceable under the Communications Act and New York law and should be severed from the RCA because it did not exclude, among other things, willful misconduct and gross negligence. (*Answer* ¶¶ 73–75.)

Global Crossing moved for partial summary judgment on the issue of damages, directly drawing Count VII into question. Focusing on the report submitted by CCT's damage expert, Stephen E. Siwek (the "Siwek Report"), which advanced two theories of damages, Global Crossing argued that § 6.2 barred recovery. In fact, Global Crossing seemed to contend that § 6.2 limited CCT to the recovery of resti-

5. Section 201 provides, in pertinent part:

 (a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor. . . .

 (b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful. . . . .

6. Count IV alleged that Global Crossing's blocking, throttling and/or choking of traffic, and its refusal to furnish service upon reasonable request, also violated 47 U.S.C. § 406. This section grants the district court jurisdiction to issue a writ of mandamus compelling a common carrier that has violated another provision of the Communications Act to provide wire or radio service upon appropriate terms. It does not provide for damages. Furthermore, the contract for services between the parties has expired, and the request for mandamus relief may, therefore, be moot.

7. Section 202(a) states:

 It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

8. Section 251(b)(1) imposes a duty "not to prohibit, and not to impose unreasonable or discriminatory conditions or limitations on, the resale of its telecommunications services."

tution damages—services paid for by CCT but not delivered by Global Crossing. (*Global Crossing Telecommunications, Inc.'s Memorandum of Law in Support of Motion for Summary Judgment on Damages,* dated Jan. 14, 2011 ("*Global Crossing Memo*"), at 2 n.1 (ECF Doc. # 200).)

CCT's opposition tracked the allegations in Count VII. It argued that § 6.2 cannot limit damages for liability imposed under 47 U.S.C. § 206 based on the breach of the statutory duty to furnish telecommunications services. Similarly, New York law prohibited a common carrier from limiting its liability for its breach of contract resulting from willful misconduct or gross negligence. CCT further argued that § 6.2 was unenforceable because it failed to expressly exclude willful misconduct and gross negligence from its scope, and should be severed from the RCA. Alternatively, CCT maintained that even if § 6.2 was enforceable, it did not bar CCT's damages because Global Crossing was guilty of willful misconduct as a matter of law. Finally, § 6.2 did not bar the ordinary contract remedy that permits the non-breaching party to recover damages measured by the "benefit of the bargain." [9]

## DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056, governs summary judgment motions. "The court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a).[10] The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law. *Rodriguez v. City of New York,* 72 F.3d 1051, 1060–61 (2d Cir.1995). If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether material factual issues exist, all ambiguities must be resolved and all inferences must be drawn in favor of the nonmoving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

## A. The Enforceability of § 6.2 Under New York Law

■ The interpretation of the RCA is governed by New York law. (*RCA* ¶ 15.) Under New York law, contractual clauses limiting liability reflect the parties' allocation of risks and are generally enforceable.

A limitation on liability provision in a contract represents the parties' Agreement on the allocation of risk of economic loss in the event that the contemplated transaction is not fully executed,

---

9. CCT filed its opposition and made a cross-motion for summary judgment after the deadline agreed to by the parties. Global Crossing moved to default CCT or preclude it from opposing Global Crossing's motion. I declined to consider CCT's tardy cross-motion, and reserved decision on the balance of Global Crossing's motion. The motion is denied for the reasons stated in a separate opinion that is being issued simultaneously with this one.

10. Global Crossing's motion is governed by the version of Rule 56 that became effective on December 1, 2010. Although some language that appeared in the prior version changed, the standard for granting summary judgment remains unchanged and the amendments will not "affect continuing development of the decisional law construing and applying these phrases." Fed.R.Civ.P. 56 advisory committee's note (2010).

which the courts should honor.... [The parties] may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made.

*Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 618 N.Y.S.2d 882, 643 N.E.2d 504, 507 (1994) (*"Metropolitan Life I"*) (quoting 5 CORBIN, CORBIN ON CONTRACTS § 1068, at 386 (1964)); *accord Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F.Supp.2d 436, 450 (S.D.N.Y.2003); *see Baidu, Inc. v. Register.com, Inc.*, No. 10 Civ. 444(DC), 2010 WL 2900313, at *4 (S.D.N.Y. July 22, 2010) (Chin, C.J.) ("Contractual provisions that 'clearly, directly and absolutely' limit liability for 'any act or omission' are enforceable, 'especially when entered into at arm's length by sophisticated contracting parties.' ") (quoting *Kalisch–Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413, 416 (1983)); *DynCorp. v. GTE Corp.*, 215 F.Supp.2d 308, 317 (S.D.N.Y. 2002) ("Under New York law, sophisticated parties with equal bargaining power can agree to limit the liability that the other may recover from a breach of contract.").

■ This rule is subject to an exception imposed by public policy. New York law prohibits parties from limiting their liability for gross negligence or willful misconduct. *Kalisch–Jarcho*, 461 N.Y.S.2d 746, 448 N.E.2d at 416 ("[A]n exculpatory agreement ... will not exonerate a party from liability under all circumstances.... [I]t will not apply to exemption of willful or grossly negligent acts.") (citations omitted); *see Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365, 1370 (1992) ("It is the public policy of this State ... that a party may not insulate itself from damages caused by grossly negligent conduct."); 103 N.Y. JUR.2D TELECOMMUNICATIONS § 104, at 231 (2005)

("Although a telephone corporation may not by contract absolutely exempt itself from liability for its negligence, it may file tariffs with the Public Service Commission which provide that no liability will attach to it in the absence of gross negligence or willful misconduct.") (footnotes omitted). Gross negligence means "conduct that evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd. v. Jewelers Prot. Servs., Ltd.*, 81 N.Y.2d 821, 595 N.Y.S.2d 381, 611 N.E.2d 282, 284 (1993); *accord Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 556 (2d Cir.1996). "Willful misconduct" in this context requires tortious intent, such as fraud, malice, a dishonest purpose or bad faith. *Kalisch–Jarcho, Inc.*, 461 N.Y.S.2d 746, 448 N.E.2d at 416–17; *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 192 A.D.2d 83, 600 N.Y.S.2d 212, 216 (N.Y.App.Div.1993) (*"Metropolitan Life II"*) (" 'Willful' is a term of tort, not contract [and] is synonymous with 'wanton' and 'reckless.' "), *aff'd*, 84 N.Y.2d 430, 618 N.Y.S.2d 882, 643 N.E.2d 504 (1994).

■ Importantly, willful misconduct does not include the voluntary and intentional failure or refusal to perform a contract for economic reasons. In *Metropolitan Life*, the defendant agreed to provide computer software and computer-related services to the plaintiff. 618 N.Y.S.2d 882, 643 N.E.2d at 505. Their contract included a limitation of liability clause which stated that "[i]n no event shall [plaintiff] be liable for any lost profits, lost savings or other consequential damages," and absolved the defendant from liability for "loss of profit, loss of business, or other financial loss resulting from [defendant's] performance or nonperformance." *Id.* at 505–06. The limitation did not apply to "intentional misrepresentations, or damages arising out of [defendant's] willful

acts or gross negligence." *Id.* at 506 (emphasis omitted).

After supplying the base system, the defendant demanded an upward adjustment of the contract price for certain enhancements, the plaintiff refused to pay it and the defendant discontinued further performance. *Id.* The plaintiff sued seeking a refund of the sums paid plus general and consequential damages, and the defendant asserted the limitation of damages clause as a partial affirmative defense. *Id.* At trial, the jury made a special finding that the defendant's acts were willful, and awarded nearly $4 million in damages. *Id.* On appeal, the Appellate Division reduced the damages to $204,000, reflecting only the compensation for the work actually performed. *Metropolitan Life II,* 600 N.Y.S.2d at 218. The Appellate Division equated willfulness with tortious conduct, concluding that "an omission to perform a contract obligation is never a tort, unless the omission is also the omission of a legal duty." *Id.* at 216 (internal quotation marks and citation omitted).

On further appeal, the New York Court of Appeals emphasized that the issue was whether the defendant's breach was "willful" within the meaning of the clause limiting liability rather than under tort law. Nevertheless, the court reached the same result as the Appellate Division. Construing the parties' agreement as a whole, it ruled that the term "willful" was intended by the parties to subsume "conduct which is tortious in nature, *i.e.,* wrongful conduct in which defendant willfully intends to inflict harm on plaintiff at least in part through the means of breaching the contract between the parties." *Metropolitan Life I,* 618 N.Y.S.2d 882, 643 N.E.2d at 508. The plaintiff had failed to prove willful misconduct because the defendant had acted out of economic self-interest:

[T]he proof, as plaintiff has indeed stressed, was that defendant's repudiation of the Agreement was motivated exclusively by its own economic self-interest in divesting itself of a highly unprofitable business undertaking in order to promote the sale of its computer software division to a competitor company.

*Id.,* 618 N.Y.S.2d 882, 643 N.E.2d at 509. Although *Metropolitan Life I* interpreted the meaning of "willful" as a contract term, it emphasized that its interpretation was consistent with the public policy exception announced in *Kalisch–Jarcho* and *Sommer v. Federal Signal Corp. Id.*

*Berner v. British Commonwealth Pac. Airlines, Ltd.,* 346 F.2d 532 (2d Cir.1965), cited by CCT in support of a different definition of "willful," is inapposite. *Berner* involved an air crash, and concerned the limitation of liability under the Warsaw Convention that excluded "willful misconduct" from the scope of the limitation. The Court of Appeals held that "willful misconduct" included "the intentional performance of an act with knowledge that the performance of that act will probably result in injury or damage," or "the intentional omission of some act, with knowledge that such omission will probably result in damage or injury." *Id.* at 536–37 (quoting *Pekelis v. Transcont'l & W. Air, Inc.,* 187 F.2d 122, 124 (2d Cir.1951), *cert. denied,* 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951)) (emphasis omitted). Although the Warsaw Convention definition is sufficient to encompass the intentional non-performance of a contractual duty for economic reasons, *Cohen v. Varig Airlines (S.A. Empresa de Viacao Aerea Rio Grandense),* 62 A.D.2d 324, 405 N.Y.S.2d 44, 50 (N.Y.App.Div.1978) ("Varig's callous disregard for plaintiffs' plight and wilful renunciation of its contractual obligation to its passengers was motivated by selfish economic interest and justifies a

finding of wilful misconduct under the provisions of the Warsaw Convention."), it is inconsistent with the New York definition of "willful" misconduct as applied to the public policy exception regarding limitation on liability clauses.[11]

■■ Here, § 6.2 does not include the public policy exception discussed above, and CCT argues that this omission renders § 6.2 invalid. It is clear, however, that a court will imply the willful misconduct/gross negligence public policy exception even when the exculpatory clause at issue fails to mention it, and enforce the limitation as implicitly modified in accordance with *Metropolitan Life I's* definition. *See Tradex Europe SPRL*, No. Civ. 1760(KMW)(FM), 2008 WL 1990464, at *4 (S.D.N.Y. May 7, 2008) (enforcing broad clause limiting liability where defendant's decision to suspend plaintiff's consulting activities did "not constitute the sort of 'egregious intentional misbehavior' that would invalidate the damages limitation provisions in the parties' consultancy agreements."); *Deutsche Lufthansa AG v. Boeing Co.*, No. 06 Civ. 7667(LBS), 2007 WL 403301, at *4 (S.D.N.Y. Feb. 2, 2007) (enforcing a broadly-drafted provision without express exclusions for gross negligence or willful misconduct, because the defendant's conduct fell "well below the levels required by the New York courts to invalidate a mutually agreed upon limitation of liability."); *Net2Globe Int'l*, 273 F.Supp.2d at 451 (enforcing a broadly-drafted limitation of liability without express exclusions for gross negligence or willful misconduct, because the defendant's decision to reroute the plaintiff's telecommunications traffic and mitigate costs was an "economically motivated decision [that] cannot, as a matter of law, rise to the level of malice or intentional wrongdoing necessary to invalidate the contracts' limitation on liability provision."); *cf. Graphic Scan-*

---

**11.** *Staton Holdings, Inc. v. MCI WorldCom Commc'ns, Inc.*, 25 F.C.C.R. 5094 (2010), which referenced the *Berner* definition, *see id.* ¶ 16 n.44, was not interpreting New York law.

CCT also cites several lower court telecommunications cases that, it maintains, demonstrate that willful misconduct and gross negligence include the carrier's unexplained or unjustified failure to furnish service or the discontinuance or interruption of existing service. (*CCT Communications Inc.'s Memorandum of Law in Support of CCT's Cross Motion for Partial Summary Judgment on Global Crossing's Ninth Affirmative Defense and Count VI of CCT's Counterclaims and in Opposition to Global Crossing's Summary Judgment Motion on Damages*, dated Feb. 26, 2011 ("*CCT Opposition*"), at 25–26 (ECF Doc. # 226).) These cases are distinguishable, primarily involving the negligent or inadvertent failure to provide telephone service, *e.g., Held v. New York Tel. Co.*, 73 Misc.2d 582, 342 N.Y.S.2d 665 (N.Y.Civ.Ct.1973); *Warren v. New York Tel. Co.*, 67 Misc.2d 348, 324 N.Y.S.2d 243 (N.Y.Civ.Ct.1971); *Babitt v. New York Tel. Co.*, 63 Misc.2d 883, 313 N.Y.S.2d 496 (N.Y.Civ.Ct.1970), or deliver a telegraph message. *E.g., Freschen v. W. Union Tel. Co.*, 115 Misc. 289, 189 N.Y.S. 649 (1921); *Mowry v. W. Union Tel. Co.*, 4 N.Y.S. 666 (N.Y.Sup. Ct.1889). None of the cases involved an economically motivated termination or interruption of service. *Mortenson v. New York Tel. Co.*, 179 Misc. 289, 38 N.Y.S.2d 949 (N.Y.App. Term.1942), *aff'g* 32 N.Y.S.2d 488 (N.Y.City Ct.1941), concerned the termination of service based upon the erroneous belief that the plaintiff had not paid his phone bill. Finally, *Balaber–Strauss v. New York Tel. (In re Coin Phones)*, 203 B.R. 184 (Bankr.S.D.N.Y.1996), involved a series of reckless if not malicious acts directed at the debtor, including the negligent misrepresentation of the amount owed by debtor for telephone service, the threat to terminate service based on the negligent computation of the debtor's bill in violation of the substantive and procedural requirements of its tariffs, the failure to implement call-blocking to eliminate certain long distance charges and the post-petition interruption of service in violation of the automatic stay. *Id.* at 212–14. The court concluded, without reference to *Metropolitan Life I* or a discussion of the scope of the public policy exception, that the defendant had engaged in willful misconduct and acted with gross negligence.

*ning Corp. v. Citibank, N.A.*, 116 A.D.2d 22, 499 N.Y.S.2d 712, 715 (N.Y.App.Div. 1986) ("In light of the public policy against the enforcement of exculpatory clauses absolving a party of all liability, no matter how egregious its conduct, the courts have implied an exclusion for willful conduct or gross negligence where the limitation fails specifically to provide for such an exception.").[12]

■ CCT also maintains that whatever the general rule, New York law does not allow a common carrier such as Global Crossing to limit its liability for breach of a statutory duty. CCT's principal support is *Emery v. Rochester Tel. Corp.*, 156 Misc. 562, 282 N.Y.S. 280 (N.Y.Sup.Ct.1935), *aff'd*, 246 A.D. 787, 286 N.Y.S. 439 (N.Y.App.Div.1935), *rev'd*, 271 N.Y. 306, 3 N.E.2d 434 (1936). There, the defendant provided telephone service to the plaintiff's household. The plaintiff's daughter fell ill, but the plaintiff was unable to contact the daughter's physician due to the allegedly negligent telephone service provided by the defendant. The daughter died, and the plaintiff sued the defendant as her personal representative. The defendant contended that the claim was barred by a provision in its tariff limiting liability for failure to provide service. 3 N.E.2d at 435. The state supreme court concluded that because New York Public Service Law § 93 imposed liability on the defendant arising from the negligent performance of its duties, the exemption in the tariff was contrary to the public policy of New York, and was void. 282 N.Y.S. at 281.

The Appellate Division affirmed without opinion, 286 N.Y.S. 439, but the Court of Appeals reversed, concluding that the plaintiff had failed to state a cause of action under the Decedent Estate Law. *See* 3 N.E.2d at 436. Addressing the limitation on liability, the Court of Appeals added:

> As to the validity of the defense of limitation of liability, we express no opinion. That defense is to be deemed an adequate answer to this insufficient complaint. *Baxter v. McDonnell*, 155 N.Y. 83, 100, 49 N.E. 667, 40 L.R.A. 670.

3 N.E.2d at 436. In the case cited by the *Emery* court, *Baxter v. McDonnell*, the Court of Appeals ruled that when a complaint fails to state a cause of action, a "defense pleaded in the answer is sufficient, for, when the complaint is defective, the answer is not demurrable." *Baxter v. McDonnell* 155 N.Y. 83, 49 N.E. 667, 671 (1898) (citing *Baxter v. McDonnell*, 154 N.Y. 432, 48 N.E. 816, 817 (1897)). In other words, if the complaint is legally insufficient, the legal sufficiency of a defense "cannot be considered." 48 N.E. at 817.

The reversal of *Emery* by the Court of Appeals, and its conclusion that the lower court should not have considered the legal sufficiency of the limitation of liability defense, undercut the precedential force of the lower court's opinion. More to the point, the principle that CCT draws from the lower court's conclusion is contrary to both prior and subsequent decisions recognizing that under New York law, a

---

**12.** Implying the public policy exception also disposes of CCT's argument that I must sever the entire § 6.2 from the RCA. A severability clause is not implicated if the court interprets the "offensive" contract clause consistent with applicable law and does not invalidate it. *See Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115, 123 (2d Cir.2010). In any event, CCT's severability argument is academic. In the absence of willful misconduct (or gross negligence), the § 6.2 is enforceable as written. If, on the other hand, Global Crossing acted willfully or was grossly negligent, the limitation does not apply without regard to severability.

common carrier can limit its liability to customers for acts that do not constitute willful misconduct or gross negligence. *E.g., Am. Tel. & Tel. Co. v. City of New York,* 83 F.3d at 556; *Net2Globe Int'l,* 273 F.Supp.2d at 456 (S.D.N.Y.2003); *Hamilton Employment Serv. v. New York Tel. Co.,* 253 N.Y. 468, 171 N.E. 710, 711 (1930); *Denmark v. New York Tel. Co.,* 103 Misc.2d 1055, 442 N.Y.S.2d 963, 963 (N.Y.App.Term.1980); *see Light's Jewelers, Inc. v. New York Tel. Co.,* 182 A.D.2d 965, 582 N.Y.S.2d 536, 538 (N.Y.App.Div. 1992); *Long Island Cent. Station, Inc. v. New York Tel. Co.,* 54 A.D.2d 893, 387 N.Y.S.2d 897, 898 (N.Y.App.Div.1976).

In the instant case, two sophisticated parties entered into an agreement that included a limitation on liability provision. Unlike the old public utility monopolies of the past, Global Crossing had no duty to provide service to CCT in the absence of the parties' contract. Although the parties heavily negotiated the Amendment, *CCT Commc'ns,* 2008 WL 2705471, at *3, and modified portions of the RCA in the process, (*see Amendment*), they did not amend the exculpatory clause. Under the circumstances, New York's contract rules relating to the enforceability of limitation of liability clauses render § 6.2 enforceable, subject to the public policy exception for willful misconduct and gross negligence.

## B. The Enforceability of § 6.2 Under the Communications Act

■ CCT contends that even if the exculpatory clause is enforceable under New York law against state law contract claims, it cannot defeat or limit a claim for damages under § 206 of the Communications Act. I disagree.

Prior to detariffing, common carriers, including telephone companies, were required to file a tariff with the Federal Communications Commission ("FCC") showing all charges for each telephone service that it provided, as well as all classifications, practices, and regulations affecting such charges. *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.,* 524 U.S. 214, 221–22, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998); *Fax Telecommunicaciones Inc. v. Am. Tel. & Tel.,* 138 F.3d 479, 482 (2d Cir.1998); *see* 47 U.S.C. § 203(a). The rights and liabilities of the parties could not be "varied or enlarged by either contract or tort of the carrier." *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.,* 524 U.S. at 227, 118 S.Ct. 1956 (quoting *Keogh v. Chicago & Nw. Ry. Co.,* 260 U.S. 156, 163, 43 S.Ct. 47, 67 L.Ed. 183 (1922)).

The tariffs frequently included limitations on the carrier's liability that were considered part of the filed rates and were enforced absent willful misconduct or gross negligence. *E.g., Am. Tel. & Tel. Co. v. New York City Human Res. Admin.,* 833 F.Supp. 962, 974 (S.D.N.Y.1993) (enforcing provision of tariff that limited plaintiff's liability to subscribers except in the case of willful conduct); *Denmark v. New York Tel. Co.,* 442 N.Y.S.2d at 963 (same); *Unimat, Inc. v. MCI Telecomm. Corp.,* 14 F.C.C.R. 7829, ¶ 12, at 7834 (1999) ("An important principle of tariff law is the recognition of the carrier's right to place a reasonable limitation on its own liability. This reasonable limitation will generally be enforced, absent willful misconduct or gross negligence on the part of the carrier.") (footnotes omitted); *In the Matter of Local Exch. Carrier Line Info. Database,* 8 F.C.C.R. 7130, ¶ 27, at 7134 (1993) ("Limitation of liability provisions have long been accepted by the courts in the absence of willful misconduct or gross negligence.") (footnote omitted); *Halpert, Inc. v. New York Tel. Co.,* 6 F.C.C.R. 2548, ¶ 7, at 2849 (1991) ("[I]t is well established that communications common carriers may

reasonably limit their liability for loss of service suffered by a customer. The Commission and the courts have reviewed tariff provisions which limit a carrier's liability to its customers for service disruptions except in cases involving gross negligence or willful misconduct and found them to be reasonable.") (footnotes omitted); *see Western Union Tel. Co. v. Esteve Bros. & Co.*, 256 U.S. 566, 571, 41 S.Ct. 584, 65 L.Ed. 1094 (1921) ("The limitation of liability was an inherent part of the rate.").

In the wake of the Federal Telecommunications Act of 1996, the FCC issued an order directing nondominant interexchange carriers to cancel their tariffs. *In the Matter of Policy and Rules Concerning the Interstate, Interexchange Marketplace (Second Report and Order)*, 11 F.C.C.R. 20730, ¶ 3, at 20732–33 (1996) ("*Detariffing Order*"), *clarified in* 12 F.C.C.R. 20787 (1997), *aff'd sub nom., MCI WorldCom, Inc. v. FCC*, 209 F.3d 760 (D.C.Cir.2000). The *Detariffing Order* reflected the recognition that the area had become highly competitive, customers were free to switch, and market forces would control rates. *Id.* ¶ 21, at 20742–43, ¶ 36, at 20750. Moreover, detariffing would prevent carriers from imposing unilateral limits on their liability, and require the carriers to bargain for those limitations with their customers. *See id.* ¶ 55, at 20762. Since detariffing, contractual limitations on liability have been enforced against claims asserted under 47 U.S.C. § 206. *See Ryder Commc'ns, Inc. v.*

*AT&T Corp.*, 18 F.C.C.R. 13603, ¶ 1 (2003) ("[W]here two parties, through valid contracts, have clearly allocated the risk of certain events, it is not unjust and unreasonable under section 201(b) [of the Communications Act] for one party to hold the other party to his contractual allocation.").

■ Furthermore, state law governs the interpretation of a limitation of liability clause asserted against a Communications Act damage claim.[13] *Net2Globe International*, with facts strikingly similar to this case, is directly on point. There, Time Warner Telecom ("TWTC"), a telecommunications carrier, entered into a contract to provide Net2Globe ("N2G"), a telecommunications reseller, with long distance service. 273 F.Supp.2d at 441–42. Shortly after TWTC began providing service, it discovered that all of the calls initiated through N2G were directed to cellular rather than land-based telephones in Europe. *Id.* at 442. This resulted in substantially increased costs to TWTC. TWTC attempted to pass the increased rates on to N2G, and also migrated N2G's traffic to other, less costly subcontractors. *Id.* When N2G refused to pay the increases, TWTC terminated all service. *Id.* at 443.

N2G subsequently sued TWTC for lost profits, alleging breach of contract and violations of the Communications Act. The contract, which incorporated TWTC's tariff, contained a clause limiting TWTC's liability for consequential damages, including lost profits, regardless of the cause.

---

**13.** In supplemental briefing requested by the Court, the parties agreed that New York law governs the interpretation of § 6.2 with respect to the Communications Act claims. (*See CCT Communications, Inc.'s Supplemental Memorandum of Law in Response to June 22, 2011 Order*, dated July 1, 2011, at 6 ("[I]f the parties had any power by contract to eliminate such a statutory liability, the only law that would govern in this case would

have to be the law of New York.") (ECF Doc. # 283); *Global Crossing Telecommunications, Inc.'s Supplemental Brief in Support of its Motion for Partial Summary Judgment on Damages*, dated July 1, 2011, at 3 ("New York state contract law-and not any generalized "federal" standard or other source of law-governs the scope of the damages waiver in Section 6.2 of the RCA.") (ECF Doc. # 284).)

*Id.* at 449. N2G countered that the clause was void, *inter alia*, because TWTC's actions constituted malice and wrongdoing. *Id.* at 451.

After tracing the New York law regarding the enforceability of clauses limiting liability and the public policy exclusions, the district court concluded that the clause limiting liability was enforceable and barred the recovery of lost profits. As to the contract claim, the court relied on *Metropolitan Life I*, and ruled that TWTC's decision to terminate service was "economically motivated," and could not, as a matter of law, "rise to the level of intentional wrongdoing necessary to invalidate the contracts' limitation on liability provision." *Id.*

Turning to N2G's damage claims under § 206 of the Communications Act, *see id.* at 458 n. 15, the court analyzed each claim and concluded that all lacked merit. *See id.* at 458–61. In addition, the court held that its earlier conclusion that the contractual limitation of liability barred any recoverable damages "presents an independent basis to deny N2G's relief under the Communications Act." *Id.* at 461. In other words, the state law rules governing liability limitations also barred recovery for lost profits under § 206 of the Communications Act. *Accord Ryder Commc'ns, Inc.*, 18 F.C.C.R. 13603, ¶ 13, at 13608–09, & n. 41 (noting that the district court had enforced a waiver of consequential damages between the same parties with respect to claims asserted under the Communications Act because AT & T's actions "did not rise to the level of specific intent required by the 'willful and wanton' standard to set aside the limitation of liability provision under New Jersey law.")

 CCT cites several cases where courts invalidated clauses that limited damages under the antitrust laws. Antitrust damages, including treble damages, advance public policy by prohibiting and ultimately punishing conduct in restraint of trade. In *Fox Midwest Theatres v. Means*, 221 F.2d 173 (8th Cir.1955), the court explained why parties could not limit this liability:

> Any contractual provision which could be argued to absolve one party from liability for future violations of the antitrust statutes against another would to that extent be void as against public policy. *This is because the effect of such a release could be to permit a restraint of trade to be engaged in, which would have impact, not simply between the parties, but upon the public as well.* Such a release, if recognized as having any validity of that nature, could therefore itself operatively serve as a contract "in restraint of trade." Section 1 of the Sherman Anti–Trust Act, 15 U.S.C.A. 1, of course, brands all contracts in restraint of trade as "illegal."

*Id.* at 180 (emphasis added) (citation omitted); *accord Kristian v. Comcast Corp.*, 446 F.3d 25, 47–48 (1st Cir.2006) ("[O]ther circuits have similarly disapproved of waivers of statutory remedies for antitrust violations. On the basis of these precedents, we conclude that the award of treble damages under the federal antitrust statutes cannot be waived.") (citation omitted); *Gaines v. Carrollton Tobacco Bd. of Trade, Inc.*, 386 F.2d 757, 759 (6th Cir.1967) ("[I]t seems clear as a matter of law that such an agreement, if executed in a fashion calculated to waive damages arising from future violations of the antitrust laws, would be invalid on public policy grounds.") (citation omitted). These cases are not apposite given the longstanding public policy that has allowed common carriers to limit their liability in the absence of willful misconduct or gross negligence. Similarly, a party cannot circumvent public policy by including an arbitration clause

that limits the plaintiff's antitrust remedy or the relief that the arbitrator could award. *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth*, 473 U.S. 614, 637 n. 19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) ("[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy.") (*dicta*).

█ CCT also cites *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115 (2d Cir.2010), a sex discrimination case, where the court observed in *dicta* that it would not enforce an arbitration agreement that included a prohibitively short statute of limitations or fee shifting provisions because "a federal court will compel arbitration of a statutory claim only if it is clear that 'the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum,' such that the statute under which its claims are brought 'will continue to serve both its remedial and deterrent function.'" *Id.* at 125 (quoting *Mitsubishi*, 473 U.S. at 637, 105 S.Ct. 3346). Antidiscrimination statutes, like the antitrust laws, are designed to deter conduct that is contrary to public policy and are subject to the same proscriptions as antitrust cases regarding efforts to limit liability. *See Chen–Oster v. Goldman, Sachs & Co.*, 10 Civ. 6950(LBS)(JCF), 2011 WL 1795297, at *10 (S.D.N.Y. Apr. 28, 2011) ("[T]he vindication of statutory rights analysis may apply with equal force to enforcement of Title VII rights as to effectuation of antitrust prohibitions under the Sherman Act.") As discussed, there is no policy that prevents parties from contractually limiting their potential liability for Communications Act claims.

Finally, CCT refers to one Communications Act case in which, according to CCT, the court invalidated a limitation on liability for claims under § 206.[14] CCT has misread the case. In *Penberthy v. AT & T Wireless Servs., Inc.*, 354 F.Supp.2d 1323 (M.D.Fla.2005), the plaintiff sued alleging that the defendant had breached its statutory duty to protect the confidentiality of proprietary information, and sought damages under 47 U.S.C. § 206 for emotional pain and psychological injury. *Id.* at 1324–25. The parties' contract included an arbitration clause that prohibited the arbitrator from awarding relief "in excess of law contrary to what this Agreement provides." *Id.* at 1326. The agreement contained a clause that limited the defendant's liability for incidental, punitive and consequential damages, or for personal injuries unless due to gross negligence. *Id.* at 1327. Finally, the agreement contained a severability clause which provided that if any portion of the arbitration clause was determined to be inapplicable or invalid, the remainder would be given full force and effect. *Id.* at 1326–27.

The issue before the court was whether the severability provision in the arbitration agreement permitted or required the action to be arbitrated despite the discrepancy between the damage remedy afforded by 47 U.S.C. § 206 and the terms of the arbitration agreement. The plaintiff argued that the entire arbitration agreement was invalid; defendant contended that the issue should be decided by the arbitrator. *Id.* at 1327. Agreeing with the defendant, the court concluded that the "the severability clause in the instant case permits the limitation of statutory remedies and the claims to be considered by an arbitrator." *Id.* at 1329. In other words, the arbitrator could decide, in the first in-

---

14. CCT also cites several cases for the unremarkable proposition that § 206 of the Communications Act confers a private right of action. (*See CCT Opposition* at 7 & n.6.)

stance, whether the limitation on remedies was valid. The court did not rule, as CCT suggests, that the limitation of liability was invalid because it was inconsistent with 47 U.S.C. § 206. (*See CCT Opposition* at 5–6.)

In a supplemental brief requested by the Court on a different issue, CCT cited *Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc.,* 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) to support an argument that "parties cannot, by contract, effect [*sic*] the scope of liability created under the Communications Act. The exclusion of liability only reaches those liabilities arising under the contract, not those arising under the Communications Act." (*CCT Communications, Inc.'s Supplemental Memorandum of Law in Response to June 22, 2011 Order,* dated July 1, 2011, at 5 (ECF Doc. # 283).) In that case, the plaintiff contracted to purchase telecommunication services from AT & T. AT & T agreed to supply the services under terms more favorable than its filed tariff provided. The plaintiff eventually sued AT & T for breach of contract and tortious interference with contract, but the Supreme Court held that the filed rate doctrine barred the plaintiff's state law claims—the only claims the plaintiff had asserted.

The tariff included a clause limiting the plaintiff's liability, except that its "liability, if any, for its willful misconduct is not limited by this tariff." 524 U.S. at 228, 118 S.Ct. 1956. The plaintiff argued that because the jury had found willful misconduct, the verdict did not conflict with the tariff. The Supreme Court rejected the argument ruling that the tariff could not revive a claim that was barred by the filed-rate doctrine. *See id.* ("It is the Communications Act that renders the promise of preferences unenforceable. The tariff can no more exempt the broken promise of preference that is willful than it can the

broken promise of preference that is unintentional."); *accord Katz v. MCI Telecomm. Corp.,* 14 F.Supp.2d 271, 276 (E.D.N.Y.1998) ("Indeed, prior to the Supreme Court's decision in *Central Office Telephone,* most courts that had considered the issue had held that the 'willful misconduct' clause did not revive claims otherwise barred by the filed rate doctrine, *i.e.,* claims directly related to tariffed rates.").

Here, Global Crossing is asserting the "willful misconduct" exception as a shield and not as a sword. It is not attempting to revive a claim barred by the Communications Act, but to limit its damages for an alleged violation of the Communications Act. Nothing in *Central Office Telephone* disturbs the long-standing doctrine permitting a carrier to limit its liability for statutory claims.

In summary, the parties may agree to limit their respective damage remedies for violations of New York law and the Communications Act except in the case of gross negligence or willful misconduct. Gross negligence is not at issue here, and New York's construction of "willful misconduct" applies to both the breach of contract and Communications Act claims. The next question is whether Global Crossing's actions, which included call blocking and the limitation or termination of services, was willful, *i.e.,* done for reasons other than economic self-interest.

## C. Willful Misconduct

█ The party asserting that public policy prohibits the enforcement of a clause limiting damages bears the burden of proving that the party relying on the clause acted with gross negligence or willful misconduct. *See Kalisch–Jarcho,* 461 N.Y.S.2d 746, 448 N.E.2d at 417–18; *cf. Baidu, Inc.,* 2010 WL 2900313, at *5 (denying motion to dismiss based on broad

clause limiting liability because plaintiff alleged sufficient facts to give rise to a plausible claim of gross negligence or recklessness); *Deutsche Lufthansa,* 2007 WL 403301, at *4 (dismissing complaint where plaintiff failed to allege misconduct required to invalidate limitation of liability clause); *Colnaghi,* 595 N.Y.S.2d 381, 611 N.E.2d at 284 (granting summary judgment where the plaintiff's allegations failed to evince the recklessness necessary to abrogate the clause limiting the defendant's liability); *L & S Motors, Inc. v. Broadview Networks, Inc.,* 25 A.D.3d 767, 808 N.Y.S.2d 777, 778 (N.Y.App.Div.2006) (affirming dismissal of complaint against provider of telephone services because "the plaintiff did not allege conduct rising to the level of gross negligence or constituting malfeasance").

 The facts surrounding Global Crossing's call blocking and withholding of services have already been discussed, and CCT has not proffered any evidence that Global Crossing engaged in "willful misconduct" within the meaning of the public policy exclusion. Global Crossing made an unprofitable deal; it was concerned about the costs resulting from the traffic CCT was terminating in the Zero–Rated Destinations, and sought to renegotiate. It sent proposed amendments to Vlahos, and plainly wanted to continue to do business with Vlahos but on more favorable terms. It was only when Vlahos declined to sign the proposed amendment (I do not suggest that he should have) that Global Crossing engaged in "self-help," essentially obtaining the benefit of the proposed amendment without Vlahos's consent. The parties continued to live under their agreement, as unilaterally modified by Global Crossing, for the next three years.

CCT concedes that Global Crossing acted out of its own economically motivated financial self-interest. (*CCT Opposition* at 26) ("[T]here is no dispute that Global Crossing failed to furnish service and blocked CCT's calls for its own economically motivated financial self-interest. . . ."). Further, nothing in the record supports the contention that Global Crossing acted out of malice toward CCT or Vlahos, or for the purpose of inflicting harm. It blocked calls and withheld service to limit its losses under an Amendment that it regretted from the moment it was signed. The consequence of the course Global Crossing chose to follow—assuming Global Crossing breached the parties' agreements—is to pay damages, except to the extent that the limitation of liability in § 6.2 of the RCA frees it from the debt. The next section of this opinion explores the final issue—the scope of that limitation.

### D. The Scope of § 6.2

 When asked to interpret contractual language on a motion for summary judgment, the question is "whether the contract is unambiguous with respect to the question disputed by the parties." *Law Debenture Trust Co. v. Maverick Tube Corp.,* 595 F.3d 458, 465 (2d Cir.2010) (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir.2002)); *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.,* 603 F.3d 169, 180 (2d Cir.2010). This presents a question of law. *Maverick Tube,* 595 F.3d at 465.

 A contract is ambiguous if it "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Int'l Multifoods,* 309 F.3d at 83 (internal quotation marks omitted); *Cont'l Ins. Co.,* 603 F.3d at 180; *Maverick Tube,* 595 F.3d at 466. "[E]vidence outside the

four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." *Maverick Tube,* 595 F.3d at 466 (quoting *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990)). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation," *Hunt Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989), unless each is a "reasonable" interpretation. *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992); *accord Maverick Tube,* 595 F.3d at 467; *see Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir.1996) ("no ambiguity exists where the alternative construction would be unreasonable"). Furthermore, a contract is not ambiguous where the interpretation urged by one party would "strain [ ] the contract language beyond its reasonable and ordinary meaning." *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957); *accord Maverick Tube,* 595 F.3d at 467. "[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 171 (2002); *accord Maverick Tube,* 595 F.3d at 468.

RCA § 6.2, entitled *"Exclusion of Consequential Loss,"* consists of an introductory phrase ("[i]n no circumstances shall either we or you be liable for . . .") followed by two clauses separated by the conjunction "or." The first clause frees both parties for "indirect, consequential, reliance, or special loss or damages." The second eliminates damages based on "lost revenues, lost savings, lost business opportunity or lost profits of any kind." Although we are dealing with words and phrases used in contract, and the question of interpretation turns on what the parties intended them to mean, some of the words and phrases in § 6.2 are typical and commonly understood.

 At the risk of oversimplification, the law divides damages for breach of contract into "general" and "consequential." *See ATI Telecom, Inc. v. Trescom Int'l, Inc.,* 95 Civ. 9749(DC), 1996 WL 455010, at *2 (S.D.N.Y. Aug. 12, 1996) (Chin, J.). A party aggrieved by a breach of contract may recover general damages without regard to the contemplation of the parties. *See* 3 DAN B. DOBBS, LAW OF REMEDIES § 12.4(7), at 98 (1993) ("DOBBS"). "General" damages are those that flow naturally and probably from the breach. *Am. List Corp. v. U.S. News & World Report, Inc.,* 75 N.Y.2d 38, 550 N.Y.S.2d 590, 549 N.E.2d 1161, 1164 (1989); *Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176, 178 (1989); *see Schonfeld v. Hilliard,* 218 F.3d 164, 175 (2d Cir.2000) ("A plaintiff is seeking general damages when he tries to recover 'the value of the very performance promised.'" (quoting 3 DOBBS § 12.2(3), at 39)). General damages are synonymous with "direct" damages, *see* BLACK'S LAW DICTIONARY 446 (9th ed. 2009) ("BLACK'S") (noting that "general damages" are also termed "direct damages"), and provide the aggrieved party with the difference between the price he agreed to pay and the value he was to receive through performance.[15] 3 DOBBS § 12.2(1), at 21.

---

**15.** Similarly, "expectancy" damages award the plaintiff the benefit of the bargain, or the value of the promised performance less the costs he avoids by not performing his own side of the bargain. 3 DOBBS § 12.2(1), at 25.

■ "Consequential," "special" and "indirect" damages are synonymous terms, *see* BLACK'S at 445–46 ("[C]onsequential damages . . . [are a]lso termed indirect damages."); 3 DOBBS § 12.2(3), at 38 ("[S]pecial damages is also referred to as consequential damages. . . ."), that "seek to compensate a plaintiff for additional losses (other than the value of the promised performance) that are incurred as a result of the defendant's breach." *Schonfeld*, 218 F.3d at 176. Consequential damages are not based on the present value of the promised performance but on the benefits that the performance will produce or the losses its absence may cause. 3 DOBBS § 12.2(3), at 41. In simplest terms, "[g]eneral damages measure the losses in the very thing to which the plaintiff is entitled . . . [while c]onsequential damages measure . . . the income it can produce or the losses it can avoid." 1 DOBBS § 3.3(4), at 304.

■ "Lost profits" may reflect either general or consequential damages. As the Second Circuit explained:

> Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements. In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract. When the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are "lost."

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007); *accord* 3 DOBBS § 12.2(3), at 42 ("The clear case of damages truly based on lost profits that also count as consequential damages is the case of lost operating prof-

its of a business."). Thus, where the plaintiff sues to recover the profits he would have earned by reselling the defendant's goods or services to a third party, he is seeking consequential damages. *See* 3 DOBBS § 12.2(3), at 42–43.

In some cases, however, "lost profits" may represent general damages. As the court in *Tractebel Energy Mktg.* further explained:

> By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages. *See Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44, 550 N.Y.S.2d 590, 549 N.E.2d 1161 (1989). The damages may still be characterized as lost profits since, had the contract been performed, the non-breaching party would have profited to the extent that his cost of performance was less than the total value of the breaching party's promised payments. But, in this case, the lost profits are the direct and probable consequence of the breach. *See id.* The profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed. *See id.*

487 F.3d at 109–10 (footnotes omitted); *see Am. List Corp.*, 550 N.Y.S.2d 590, 549 N.E.2d at 1164. Furthermore, since "lost revenues" are a part of the lost profits equation, *In re Best Payphones, Inc.*, No. 01–15472(SMB), 2007 WL 1388103, at *17 (Bankr.S.D.N.Y. May 8, 2007) ("[L]ost profits consist of the lost revenues less the expenses saved over the remaining life of the [contract]."), *aff'd*, 432 B.R. 46 (S.D.N.Y.2010), "lost revenues" are subject to the same distinction.

Finally, "reliance damages" refers to the expenditures made in preparation for performance or in performance less any loss the aggrieved party would have suffered had the contract been performed. RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981); *see* BLACK'S 448; 3 DOBBS § 12.2(1), at 52. For example, if a retailer contracts to buy merchandise from a supplier and advertises the merchandise for resale, the advertising costs are reliance expenses and, upon the supplier's breach, the retailer can recover reliance damages as an alternative to expectancy damages. 3 DOBBS § 12.2(1), at 52.

Returning to § 6.2 of the RCA, the meaning of the first clause, standing alone, is straightforward. It expressly bars all consequential and reliance damages. Instead, the ambiguity lies in the second clause which bars "lost revenues, lost savings, lost business opportunity or lost profits of any kind." Global Crossing contends that the second clause excludes claims for direct damages, and that CCT is limited to restitution—the services it paid for under the Amendment but never received. (*Global Crossing Memo* at 2 n.1 ("Section 6.2 does not purport to prohibit CCT's entitlement to all damages for a breach. Rather, restitution damages are recoverable."); *Global Crossing Telecommunications, Inc.'s Reply Memorandum of Law in Support of Motion for Summary Judgment on Damages*, dated March 31, 2011 ("*Global Crossing Reply*"), at 6 (ECF Doc. # 243) ("[T]he plain meaning of the clause itself is manifest—any non-restitution damages are excluded.").) It argues that by separating the second part of the clause from the first with the conjunction "or," and by including in it the words "of any kind," the parties meant to bar claims for both direct and consequen-

tial lost revenues, lost savings, lost business opportunity, and lost profits. (*Global Crossing Memo* at 16.) Specifically, the "or" is disjunctive, and the various "lost" categories following it stand in contrast to the "broad" categories of damages in the first clause. (*Id.*) This contrast is amplified by the words "of any kind"; while the broad theories are limited to consequential and other collateral losses, the "lost" theories are "of any kind," including both direct and indirect theories of damages. (*Id.*)

Global Crossing gives special weight to "lost savings." According to Global Crossing, "savings" means the difference between the lower costs that a buyer obtains by purchasing a service at a below market price, as "a shopper achieves savings by buying at a discount," or, put differently, "the additional profit that the buyer would have earned as a result of the below-market price services to be provided by the seller." (*Global Crossing Memo* at 22.) "Savings" are "lost" when "a buyer is deprived of a below-market buying opportunity and must purchase equivalent goods or services at the higher market price." (*Global Crossing Reply* at 8.) This definition of lost savings directly corresponds with a market value recovery, which would award CCT "the difference between the contracted-for price and the price at which the service may otherwise have been available in the market to CCT." (*Global Crossing Memo* at 23.) In short, "lost savings" equates to the ordinary benefit of the bargain market damages that an aggrieved party could recover as general damages.

Global Crossing cites a number of sources to support its interpretation of "savings" and "lost savings." (*Id.* at 23–23.) [16] Global Crossing also argues that its

---

**16.** *See, e.g.,* Stanley Warner & Fredrick Whitehurst, *An Illustration of Inventory Loss* *Measurements Under the LCM Rule,* 1 ACCT. EDITOR's J. 33 (Fall 1988) (describing "lost

interpretation of "savings" is consistent with the usage in the telecommunications industry, citing a promotional document from Arbinet, the "telecommunications services company that CCT has repeatedly held up as the definitive provider of 'market price' telecommunications transactions." (*Declaration of Elizabeth Marks in Support of Global Crossing Telecommunications, Inc.'s Motion for Protective Order*, dated Mar. 1, 2011, Ex. 8 (ECF Doc. # 232).)

CCT interprets the second clause more narrowly. It claims that "lost revenues" and "lost profits" are examples of consequential losses and that "lost savings" is an example of reliance (or, in the alternative, consequential) damages. (*CCT Opposition* at 46 (Lost savings refers to "funds ..., *i.e.*, expenditures, made in reliance on the contract.").) To support this interpretation, CCT notes that reliance damages measure "the extent that the plaintiff expends money in essential reliance," and that a "typical use of the phrase 'lost savings' in ordinary parlance might be 'the investor lost all his savings in reliance on Mr. Madoff's ponzi scheme.'" (*Id.*)

In addition, CCT disputes Global Crossing's definition of "lost savings," arguing that it simply reflects another type of consequential loss. (*Id.* at 47 ("Lost savings are equally consequential as are lost profits.").) Thus, CCT notes, courts have required parties attempting to claim "lost cost savings" to show that they communicated their special circumstances and that the loss was reasonably foreseeable (a requirement for obtaining consequential, but not direct, damages). (*Id.* at 47 (citing *ProfiTel Group, LLC v. PolyOne Corp.*, 238 Fed.Appx. 444, 450 (11th Cir.2007) ("A

claim for lost cost-savings is analogous to a claim for lost profits.... [I]t requires that the[y] ... were within the contemplation of the parties at the time the contract was made, the loss ... is the probable result of the breach of contract, and ... [they] are not remote and speculative.")).)

Having considered the parties' arguments and examined the parties' entire contract, I conclude that § 6.2, specifically the second clause, is ambiguous. As noted, the first clause is clear. It bars consequential damages, and neither party has disputed this. Thus, CCT cannot recover lost profits because it was unable to resell the telecommunication services that Global Crossing failed to deliver.

As noted, the second clause presents the interpretative problem. Its introduction by the disjunctive "or," suggests that the various categories of "lost" damages ("of any kind") add additional limitations to those in the first clause. For example, the second clause may bar "lost profits" or "lost revenues" that fall within the category of general damages. Furthermore, "lost savings" is inherently ambiguous, and rarely appears in the case law. CCT's interpretation, which essentially equates the term with reliance damages, lacks support.

On the other hand, Global Crossing's argument that § 6.2, and particularly the phrase "lost savings," bars all damages other than restitution is a stretch. Section 6.2 expressly bars consequential and indirect damages, but does not mention general or direct damages. If § 6.2 was intended to bar general damages and direct damages, it could have said so directly. Furthermore, the heading of § 6.2, "exclusion of consequential loss," is rele-

cost savings" as "the reduction in replacement cost"); *Speaking TEM-ese,* TELECOM MANAGER'S VOICE REP., Nov. 27, 2006, at 8, *available at* http://www.thevoicereport.com/2006-11-27/

VoiceReport2006-11-27.pdf (describing the term "revenue leakage" as "lost savings, for example, the difference in what you contracted for and what you're paying").

vant to the interpretation of an ambiguous exculpatory clause, *see World–Link, Inc. v. Citizens Telecomms. Co.*, No. 99 Civ. 3054(GEL), 2000 WL 1877065, at *3 (S.D.N.Y. Dec. 26, 2000) (Lynch, J.), and suggests that § 6.2 was not meant to encompass general damages.

Finally, although the exculpation granted by § 6.2 is mutual, other provisions of the RCA allow Global Crossing to recover the type of "lost revenues" or "lost profits" generally associated with direct damages. If Global Crossing terminated the RCA based on a CCT breach, CCT was required to pay Global Crossing 100% of the Monthly Recurring Charges ("MRC") remaining for the service term in addition to charges, if any, relating to the early termination of any local access circuits. (*RCA* § 5.3; *accord Vlahos Decl.*, Ex. 8 at § 6.8.) The parties agreed that the termination fees provided for in § 5 of the RCA "are based on agreed *revenue* expectation and are not a penalty." (*RCA* § 5.3 (emphasis added).) The MRC was $71 per concurrent call session, (*Amendment* ¶ 7), and CCT "purchased" 1,344 concurrent call sessions for a period of three years ending in December 2009. Hence, if CCT breached the parties' contract and Global Crossing terminated it, CCT still had to pay $95,424 per month until December 2009. This amount reflected direct damages—the lost revenues under the parties' contract.

Accordingly, I decline to interpret the full scope of § 6.2 as a matter of law, except to the extent that I conclude, as both sides agree, that it bars claims for consequential, indirect or special damages. These categories include any damage theories based on what CCT could have earned through contracts with third parties who might have bought or used the telecommunications services that Global Crossing failed to provide. I expressly decline to conclude as a matter of law that § 6.2 bars general or direct damage claims, but recognize the possibility that extrinsic evidence, including trade usage, may explain its meaning.

## CONCLUSION

Section 6.2 is enforceable, and bars claims for consequential damages. Whether it also bars claims for general, direct damages is unclear and must be resolved at trial. The Court has considered the parties' other arguments and concludes that they lack merit.

So ordered.